# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS

JOSEPH CLARK, III                           NO.: 15-00049-BAJ-RLB

## RULING AND ORDER

Before the Court is Joseph Clark, III's ("Defendant's") **Motion to Suppress (Doc. 14),** seeking to suppress "all illegally and improperly seized and obtained evidence of any nature in this matter, and/or statements by Defendant." (*Id.* at p. 1). The United States of America ("Government") filed a memorandum in opposition. (Doc. 16). On June 30, 2015, the Court held an evidentiary hearing on the motion, and permitted the simultaneous filing of post-hearing briefs. (*See* Docs. 18, 19). For the reasons explained below, Defendant's Motion is **GRANTED**.

## I.    BACKGROUND

At 11:05 a.m. on October 3, 2014, the Honorable Michael Erwin of the Nineteenth Judicial District Court signed a search warrant ordering a search of a residence located at 3030 Congress Boulevard, Building One, Apartment 10, in Baton Rouge, Louisiana. (Doc. 16-1 at p. 1). The warrant authorized police to search for "[a] quantity of controlled dangerous substances (CDS), To Wit: Heroin, as well as any and all papers, vehicles, records, documents, monies, paraphernalia and unmentioned contraband associated with the abuse and distribution of said

CDS," as well as "any weapons and/or equipment that may aid in the trafficking or protection of the same." (*Id.*). The search was limited to the residence, but included all structures and vehicles *on the premises*. (*Id.*) (emphasis added).

In the two days prior to the issuance of the warrant, the Baton Rouge Police Department ("BRPD") set up and executed a controlled purchase of illegal narcotics at the location on Congress Boulevard after a confidential informant told police that Defendant was selling heroin out of his apartment. (Doc. 16 at p. 2). The informant also told police that he had been a passenger in Defendant's vehicle on numerous occasions and observed Defendant to be in possession of a handgun. (Doc. 16 at p. 3). These actions and statements formed the basis for the warrant.

As the search unit worked to obtain the search warrant and prepare to execute it, BRPD Detectives Drew White and Shannon Helaire were conducting surveillance outside of 3030 Congress Boulevard. Although the time frame is unclear, at some point prior to the execution of the warrant, detectives observed two subjects – one matching Defendant's description and another later identified as Lorenzo Stovall – exit the premises and get into a purple, 2010 Camaro and drive away.

Detectives then followed Defendant's car and ultimately pulled Defendant over after being instructed by Detective David Burtwell to "shut him down." Detective Burtwell admitted at the evidentiary hearing that there was no evidence that Defendant committed any crime or was engaged in illegal activity when he left his residence. The police report allegedly stated that Defendant was stopped for

speeding and/or improper lane usage, but the police report was not admitted into evidence nor submitted as an exhibit to any of the memoranda before the Court. At the evidentiary hearing, officers testified that a traffic violation was "one of the reasons" for the stop. However, both officers repeatedly affirmed that the primary justification for stopping Defendant was the then-forthcoming search warrant. They further confirmed that officers performed no routine traffic stop procedures, such as requesting license and registration, and they did not issue a citation. Instead, detectives placed Defendant and his passenger in handcuffs, advised them of their *Miranda* rights, informed them of the pending investigation, and took the two into custody. Officers then waited. Approximately fifteen to thirty minutes later, officers transported Defendant and his passenger back to the apartment on Congress Boulevard in a police vehicle while another officer drove Defendant's car back to the residence.

Although the general time frame is unclear, at some point thereafter, officers executed the search warrant, and searched Defendant's person, his residence and his car. The search yielded quantities of heroin and a firearm. Defendant was subsequently indicted on April 8, 2015, with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and one count possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). (Doc. 1). In the instant motion, Defendant does not contest the legality of the search of his residence, but seeks suppression of the $960.00 and one gram of heroin found on his person, and the bag containing twenty-two ounces of heroin found under the driver's

seat of his car. The question raised by Defendant's motion is whether the stop of his vehicle and his subsequent detention at some distance[1] away from the subject of a search warrant was permissible.

## II. DISCUSSION

The principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions" is among those most firmly ingrained in our constitutional criminal procedure jurisprudence. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993) (quoting *United States v. Smith,* 978 F.2d 171, 176 (5th Cir. 1992)). However, in cases where a search is not conducted pursuant to a warrant, the government bears the burden of proving that the search was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Castro*, 166 F.3d 728, 733 n.7 (5th Cir. 1999)).

---

[1] Although Defendant's exact distance from his residence at the time of the stop was not made clear at the hearing, the Court is satisfied as the fact finder that the distance certainly would not qualify as being within the immediate vicinity of the premises or the curtilage of Defendant's home. *See Bailey v. United States*, ___ U.S. ___, ___, 133 S. Ct. 1031, 1037-43 (2013); *United States v. Dunn*, 480 U.S. 294, 300 (1987) (discussing the common law concept of curtilage as "the area immediately surrounding a dwelling house," but noting that the concept does not lend itself to rigid boundaries).

**A.    Whether the Seizure of Defendant and Subsequent Search of His Person and Vehicle was Lawful Pursuant to the Terms of the Search Warrant**

Defendant argues that because officers neither possessed an arrest warrant nor had requisite suspicion to justify an investigatory stop, the traffic stop and detention of his person were "accomplished and carried out beyond the limits of the [Fourth] Amendment." (Doc. 14 at p. 2).  In opposition, the Government argues that the procedures used were sanctioned by the Supreme Court in *Michigan v. Summers*, 452 U.S. 692 (1981), and the facts of the instant case "closely parallel" those in *Summers*.  (Doc. 16 at p. 7).  Thus, according to the Government, all of the evidence was obtained lawfully pursuant to a search warrant.  In drawing this faulty comparison, however, the Government completely ignores the more recent case of *Bailey v. United States,* ___ U.S. ___, 133 S. Ct. 1031 (2013), which placed a spatial limitation on the rule articulated in *Summers*.

In *Bailey*, officers were sitting outside an apartment preparing to execute a search warrant when two men matching the description of the suspect left the apartment, got into a car and drove away.  *Id.* at 1036.  The police followed the car for roughly one mile before stopping it.  *Id.*  The men were ordered out of the car, patted down, and briefly questioned before being handcuffed.  *Id.*  Officers then drove the two men back to the apartment in a patrol car, while another officer drove the seized car.  *Id.*  By the time they returned, the search team had already discovered a firearm and illegal narcotics in plain view inside the apartment.  *Id.* Both men were then placed under arrest.

By contrast, the officers in *Summers* encountered the defendant on his front steps as they approached to execute the search warrant. *Summers*, 452 U.S. at 693. Instead of being permitted to leave, officers requested the defendant's assistance in gaining entry, and then detained him while they searched the premises. *Id.* After discovering narcotics in the basement and confirming that defendant owned the residence, the defendant was arrested and a search was conducted pursuant to arrest. *Id.* Heroin was found in the defendant's pocket. *Id.*

Here, BRPD detectives were conducting surveillance outside of Defendant's residence when they observed two subjects – one matching Defendant's description – exit the premises and get into a 2010 Camaro. Detectives tailed Defendant's car and ultimately pulled Defendant over. The testimony revealed that the two men were almost immediately handcuffed, advised of their *Miranda* rights and the pending investigation, and placed in the back of a police vehicle. After an inexplicable delay of fifteen to thirty minutes, they were subsequently transported back to the apartment on Congress Boulevard while another officer drove Defendant's car to the residence. Then, after an additional delay of several minutes, officers ultimately executed the search warrant, which included a search of Defendant's person, his residence and his car.

Thus, the facts of *Bailey* are clearly much more analogous to the facts here. Indeed, the facts of the instant case only further underscore the Supreme Court's rationale in imposing spatial constraints to the rule articulated in *Summers* that the law enforcement interests justifying the detention of occupants of the premises

during the execution of a search warrant – officer safety, facilitating the completion of the search, and preventing flight – are simply not present when a suspect leaves the immediate vicinity of the premises to be searched. As a result, those interests do not provide a basis for seizing or searching a defendant who is no longer on the premises or in the area. *Bailey*, 133 S. Ct. at 1038. As the Supreme Court stated, "the decision to detain must be acted upon at the scene of the search and not at a later time in a more remote place." *Id.* at 1042. Here, the officers' actions were neither proximate to the location of the search warrant, nor the time of its execution. Therefore, like the seizure and subsequent search in *Bailey*, the seizure of Defendant and subsequent search here, were not justified pursuant to the terms of the search warrant.

As an aside, the Court is compelled to note that the position articulated by the Government is deeply troubling in its failure to recognize that one of the core protections afforded by the Fourth Amendment is the particularity requirement. U.S. Const. amend. IV ("no Warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized"). In arguing that the officers' actions were justified because police had a search warrant for the car, the Government misses a critical distinction – the warrant permitted a search of Apartment 10 at 3030 Congress Boulevard, and extended that search to all vehicles *on the premises*; it did not actually individually authorize a search of Defendant's 2010 Camaro. It was not, therefore, "entirely appropriate to stop Defendant as he drove away" in a vehicle that the police were

not specifically authorized to search, absent its being in the immediate vicinity at the time the warrant was executed.[2] Had the search of the Camaro been desired, the affiant should have described it with particularity when seeking the warrant.

Though *Bailey* governs the scope of the police's power in the context of executing a search warrant under these circumstances, *Bailey* is not completely dispositive. In *Bailey*, the Supreme Court left open the question of whether the detention of a defendant who left the immediate vicinity of a premise may be searched pursuant to some other rationale. *Bailey*, 133 S. Ct. at 1043. Because the issue was not properly before the Court, it merely opined:

> If officers elect to defer the detention until the suspect or departing occupant leaves the immediate vicinity, the lawfulness of detention is controlled by other standards, including, of course, a brief stop for questioning based on reasonable suspicion under *Terry* or an arrest based on probable cause. A suspect's particular actions in leaving the scene, including whether he appears to be armed or fleeing with the evidence sought, and any information the officers acquire from those who are conducting the search, including information that incriminating evidence has been discovered, will bear, of course, on the lawfulness of a later stop or detention.

*Id.* at 1042. Thus, having found that the search of Defendant's person and car were not lawful pursuant to the search warrant, the question remains whether the seizure of Defendant and subsequent search of his car and person after being transported to his residence were lawful on some other basis.

---

[2] The Government's assertion also mischaracterizes the evidence adduced at the hearing, as the officers' own testimony revealed that Defendant was not stopped "as he drove away" from the premises, but rather was stopped at some distance from the premises.

**B.** **Whether the Seizure of Defendant was a Lawful Arrest or a Lawful Traffic Stop**

Beyond the search warrant, the Government offers two additional justifications for the seizure and subsequent search of Defendant's person and vehicle: (1) officers already had probable cause to arrest Defendant based on his participation in a controlled-buy several days prior to the search, coupled with testimony from a confidential informant that Defendant had been seen with a firearm in the past, and (2) Defendant committed a traffic violation. (Doc. 16 at p. 8).

The Government's first contention is wholly without merit. "To determine whether an officer had probable cause to arrest an individual, [a court must] examine the *events leading up to the arrest*, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States,* 517 U.S. 690, 696 (1996) (emphasis added)). "Probable cause exists when the facts available at the time of the arrest would support a reasonable person's belief that an offense *has been, or is being, committed* and that the individual arrested is the guilty party." *Blackwell v. Barton*, 34 F.3d 298, 303 (5th Cir. 1994) (emphasis added). This standard does not contemplate arrests multiple days after alleged illegal activity is observed, as obtaining an arrest warrant is the more appropriate course of action under those circumstances. Instead, this standard implies contemporaneity. Interestingly, all of the case law

9

cited by the Government confirms this proximity requirement. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (reiterating the rule requiring that the offense establishing probable cause be "closely related" to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest in a case where officers pulled over and subsequently arrested defendant for impersonating a police officer); *United States v. Hearn*, 563 F.3d 95, 103 (5th Cir. 2009) (after receiving information from confidential informants that the defendant was selling methamphetamine out of a hotel room, the officers set up a controlled buy; the defendant was arrested moments later while walking to the vending machine); *United States v. Mills*, 555 F. App'x 381, 383 (5th Cir. 2014) (defendant was arrested without a warrant when he arrived at an agreed-upon location in the car predicted pursuant to a codefendant's arranging a purported drug transaction). Thus, although the events in the days leading up to Defendant's arrest may have provided a sufficient basis to obtain an arrest warrant,[3] or a sufficient basis on which to arrest Defendant at the time the controlled-buy took place, the probable cause was not present on October 7, 2014, at the time of Defendant's arrest, when officers confirmed that they did not witness Defendant doing anything illegal. Accordingly, the only possible justification remaining is whether the seizure constituted a lawful traffic stop.

---

[3] In rendering this decision, the Court is compelled to note that the outcome of this ruling likely would have been quite different had BRPD obtained an arrest warrant in addition to a search warrant.

Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v. Prouse,* 440 U.S. 648, 653 (1979); *United States v. Jones,* 234 F.3d 234, 239 (5th Cir. 2000). However, because a routine traffic stop tends to be "a relatively brief encounter," it is considered "more analogous to a so-called '*Terry* stop' . . . than to a formal arrest." *Knowles v. Iowa,* 525 U.S. 113, 117 (1998) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 439 (1984), in turn citing *Terry v. Ohio,* 392 U.S. 1 (1968)). See also *Arizona v. Johnson,* 555 U.S. 323, 330 (2009). Therefore, courts must analyze the legality of traffic stops under the standard articulated in *Terry,* which evaluates: (1) whether the officer's action was "justified at its inception," and (2) whether the officer's subsequent actions were "reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Lopez–Moreno,* 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry,* 392 U.S. at 19-20).

Regarding the first prong of the *Terry* analysis, the United States Court of Appeals for the Fifth Circuit has held that "[f]or a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Lopez-Moreno,* 420 F.2d at 430. *See also Whren v. United States,* 517 U.S. 806, 810 (1996) (permitting a police officer to stop a vehicle if he has probable cause to believe a traffic violation has occurred).

Here, detectives testified to conflicting reasons for making the initial stop of Defendant's vehicle. They first testified that they stopped Defendant for speeding

and/or improper lane usage. Neither party introduced the police report into the record, so the Court is unsure what precise justification was offered on October 7, 2014. Nevertheless, the manner in which the officers spoke of the alleged traffic violation(s) suggested that a violation was not the true basis for the stop, if one occurred at all. In addition, Detective Burtwell admitted at the evidentiary hearing that there was no evidence that Defendant committed any crime when he left his residence. Instead, he repeatedly affirmed that the basis for stopping Defendant was the forthcoming search warrant. Further, Detective White fervently advocated that he stopped Defendant after being instructed to do so by Detective Burtwell. More specifically, Detective White testified that he and his partner followed Defendant pursuant to orders, and then ultimately pulled Defendant over after being instructed to "shut him down." Thus, the Court must conclude that this was the true motivation for the stop. For reasons already discussed, a stop of a vehicle based upon a search warrant for a residence is not "justified at its inception," and thus, is improper.

Even assuming that the stop was lawfully made pursuant to suspicion of a traffic violation, the Government cannot sustain its burden with respect to the second prong. Generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop . . . ." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). Stated differently, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v.*

*Valadez*, 267 F.3d 395, 398 (5th Cir. 2001) (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)). Then, "once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion. 'At that point, continuation of the detention is no longer supported by the facts that justified its initiation.'" *Id.* (quoting *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993)). *See also Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1615 (2015) (recently reiterating the principle that an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop[, but] . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.")

Here, the officers' actions immediately following the stop were wholly unrelated to a possible traffic violation. Detective White expressly admitted that the officers took no actions relative to a traffic stop, such as asking for Defendant's license and registration. Instead, upon stopping Defendant's vehicle, Defendant and his passenger were immediately detained, placed into handcuffs, and read their *Miranda* rights. The Government's position that the officers conducted a valid traffic stop is further undercut by the officers' failure to perform the searches at the location where the vehicle was stopped. Instead, officers waited until after Defendant and his vehicle were transported back to the immediate vicinity of his residence and the search unit arrived to execute the warrant to conduct a search of Defendant's person and the Camaro. Therefore, the Court finds that this hesitation further evidences a lack of authority independent of the warrant. Accordingly, the

evidence was obtained unlawfully and thus, must be suppressed.

For the foregoing reasons,

**IT IS ORDERED** that Defendant's **Motion to Suppress (Doc. 14)** is **GRANTED.**

**IT IS FURTHER ORDERED** that a jury trial is set for <u>**September 21 - 22, 2015, at 8:30 a.m.**</u> A pretrial conference will be held in chambers on **September 8, 2015 at 2:00 p.m.**

Baton Rouge, Louisiana, this _24th_ day of August, 2015.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**